**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 11-20856-CV-SEITZ/SIMONTON**

YAMILL RAMOS PEREZ,

      **Petitioner/Movant,**

v.

UNITED STATES OF AMERICA,

      **Respondent.**

_____/

**REPORT AND RECOMMENDATION**

      Presently pending before this Court is the Motion to Vacate filed by Movant Yamill

Ramos Perez ("Mr. Ramos Perez" or "Movant"), ECF No. [1].  Following an extended stay

of the proceedings based upon the joint request of the parties while they tried to resolve

this matter, the Government filed a Response in opposition, ECF No. [17].  Pursuant to an

Order entered by the undersigned Magistrate Judge that required clarification of the

claims, the Movant filed his Affidavit to support the Motion, ECF No. [19], and a

Supplemental Memorandum, ECF No. [20].[1]  An evidentiary hearing was held on July 10,

2015.  At that hearing, counsel for the Movant clarified that he sought to vacate only his

sentence; he did not seek to vacate his guilty plea.[2]  For the reasons stated below, the

undersigned **RECOMMENDS** that the Motion be **DENIED**.

---

[1]  The Government filed a Motion to Strike this Supplement, contending that the
Supplement was confusing and impermissibly added claims that were not included in the
original Motion to Vacate, ECF No. [22].  In Response, the Movant stated that he had only
clarified his original claims, ECF No. [23]. The undersigned denied the Motion to Strike
without prejudice to the Government's right to challenge at an evidentiary hearing any
claims that it contends do not relate back to the original Motion to Vacate and therefore
are time-barred, ECF No. [24].

[2]   In this regard, the undersigned notes that the Movant did not testify, and there is no
evidence in the record to support a finding that the Movant would not have entered his
guilty plea if the errors he alleges had not occurred.

I.    **THE CLAIMS PRESENTED IN THE MOTION TO VACATE**

As clarified at the evidentiary hearing on the Motion to Vacate, the Movant contends that his sentence should be vacated since he received ineffective assistance of counsel, in violation of the Sixth Amendment, in connection with the following matters.  First, he claims that counsel rendered ineffective assistance of counsel at sentencing because his attorney, Hugo Rodriguez, Esq., failed to adequately investigate and present mitigating evidence of his mental condition, including the failure to obtain a mental health evaluation of the Movant, the failure to speak to the family of the Movant to learn details of his mental health issues, and the failure to obtain medical records to present to the Court.  Next, the Movant claims that his counsel had a conflict of interest due to counsel's "allegiance" to Eliades Pena-Alcolea.  Specifically, the Movant contends that his counsel prevented him from providing the Government information about the criminal activities of Pena-Alcolea, and this deprived the Movant of the opportunity to receive a lesser sentence based on providing substantial assistance to the Government. Mr. Ramos Perez also complains that his attorney did not adequately confer with his family; but clarified at the hearing that this alleged failure is not a separate claim but is evidence that supports the first two claims.  Finally, the Movant contends that counsel failed to adequately explain the waiver of his right to appeal which is contained in the plea agreement, and failed to follow the Movant's instructions to file a notice of appeal.[3]

For the reasons set forth below, the undersigned finds and concludes that counsel adequately investigated and presented evidence of the Movant's mental health issues to the Court at sentencing and there is no reasonable probability that any

---

[3]  The Movant's claim regarding the failure to adequately explain the appeal waiver was not raised until the evidentiary hearing, and therefore to the extent it could be considered an independent claim, it is time-barred.  In any event, since the Movant is not challenging the voluntariness of his guilty plea, the undersigned considers the Movant's testimony in this regard only to the extent that it bears on his claim that he requested his attorney to file a notice of appeal.

omission would have affected the sentence imposed; that counsel did not represent or have any allegiance to the Movant's domestic partner, Eliades Pena-Alcolea, did not in any way seek to prevent the Movant from providing information to the Government about the activities of Mr. Pena-Alcolea, exercised his full loyalty to the Movant, and had no conflict of interest; and, that the Movant was fully advised of the appeal waiver provisions of his plea agreement, counsel fully discussed the right to appeal with the Movant after the sentencing and before the deadline for filing a notice of appeal had expired, and, that as a result of this conversation, the Movant advised counsel that he did not want to appeal.   Therefore, the Movant did not receive ineffective assistance of counsel, and his Motion to Vacate should be denied.

## II.     BACKGROUND AND PROCEDURAL HISTORY OF THE CRIMINAL CASES

Movant Yamill Ramos Perez was charged in two separate criminal cases, which were consolidated for purposes of entering a guilty plea and sentencing.  In Case No. 09-20842-CR, he was charged in a two-count Information with conspiracy to commit health care fraud in connection with the submission of fraudulent Medicare claims by two different pharmacies—El Palenque Farmacia Corp. for claims submitted between May 21, 2008, and July 14, 2009 (Count 1); and, Meli Pharmacy for claims submitted between September 21, 2006, and July 2, 2009 (Count 2), ECF No. [1].   In Case No. 09-20681-CR, Movant Ramos Perez was charged in a four-count Indictment with making interstate communications containing threats to a Medicare investigator and a high ranking employee of the Center for Medicare and Medicaid Services (Counts 1 and 3); and with making interstate communications with the intent to harass and cause substantial emotional distress to the Medicare investigator and employee (Counts 2 and 4), ECF No. [3].

Pursuant to a written plea agreement, Mr. Ramos Perez entered a guilty plea to both conspiracy counts set forth in the Information in Case No. 09-20842-CR, ECF No.

[12]; and, entered a guilty plea to Count 2 of the Indictment in Case No. 09-20681-CR, which charged him with making interstate communications with intent to harass the Medicare investigator, ECF No. [30].  The Plea Agreement contains a detailed factual statement to support the offenses to which Mr. Ramos Perez pled guilty.  For purposes of the present Motion to Vacate, the relevant part of the statement pertains to the fraudulent claims filed through Meli Pharmacy and the role of Eliades Pena-Alcolea, which is the basis for Count 2 of the Information filed in Case No. 09-20842-CR.  The Plea Agreement contains, *inter alia*, the following description:

> Meli Pharmacy and Supplies, Inc. is a DME/prescription disbursement facility in Hialeah, Florida.  Although his name never appears on the corporate paperwork, RAMOS PEREZ had control over Meli Pharmacy, through its nominee owner, Eliades Pena-Alcolea.  Eliades Pena-Alcolea assumed control of Meli Pharmacy on July 19, 2006, and completed the Medicare paperwork on July 18, 2006.  RAMOS PEREZ claimed to be a co-owner of Meli Pharmacy during an on-site visit on September 21, 2006.  Finally, Eliades Pena-Alcolea opened a Bank of America account for Meli Pharmacy, and RAMOS PEREZ was an authorized signor.

> From approximately September 21, 2006, through July 2, 2009, Meli Pharmacy submitted approximately $18,212,691 in bills and was paid approximately $5,321,318.  The vast majority of these claims were fraudulent.

09-20842-CR, ECF No. [12] at 7.

The Plea Agreement also contained an appeal waiver, which provided that Mr. Ramos Perez waived his right to appeal his sentence unless it exceeded the maximum permitted by statute; was the result of an upward departure and/or a variance from the guideline range established by the Court at sentencing; or the Government appealed.  In this paragraph, Mr. Ramos Perez acknowledged that he had discussed the appeal waiver set forth in the agreement with his attorney, and the parties jointly requested the Court to enter a specific finding that the appeal waiver was made knowingly and voluntarily.  09-20842-CR, ECF No. [12] at 9-10.

During the plea colloquy on December 4, 2009, Mr. Ramos Perez stated that he had been able to communicate with his attorney, Mr. Rodriguez; that Mr. Rodriguez had been available to speak to him whenever Mr. Ramos Perez felt it was necessary to discuss his cases; and that Mr. Rodriguez had spent sufficient time with him and had answered all of his questions, 09-20681-CR, ECF No. [43] at 7-8.  He stated that he was satisfied with Mr. Rodriguez's representation and advice, and that there was nothing he would have liked Mr. Rodriguez to do differently on his behalf.  *Id.* at 21.  Mr. Ramos Perez also stated that he had not recently been treated for any mental illness and did not have any medical condition that might affect his ability to understand the proceedings; although he was taking prescribed medication for depression and had been doing so for more than a year.  *Id.* at 8-9.  Mr. Ramos Perez confirmed that the factual statement was accurate, and that he and Mr. Rodriguez had reviewed each of the 16 paragraphs of the plea agreement.  *Id.* at 16-19.  Mr. Ramos Perez also confirmed that he was aware of the appeal waiver provision of the plea agreement, that he had discussed it with Mr. Rodriguez, that he understood it, and that it was his decision to waive his right to appeal.  *Id.* at 31-33.  He specifically acknowledged he understood, as summarized by the Court, "that basically the result of this Plea Agreement is you are basically saying to me, 'Judge, I'm going to accept whatever sentence you give me and say thank you very much.'"  *Id.* at 32.

The Court conducted a sentencing hearing on March 2, 2010.  At the commencement of the hearing, Mr. Rodriguez asked the Court to continue the sentencing to give Mr. Ramos Perez the opportunity to complete his cooperation with the government and, hopefully, obtain a reduced sentence based on that cooperation, ECF No. [20-1] at 3-5.  Mr. Rodriguez made this request at sidebar, stating that the family of Mr. Ramos Perez was present in the courtroom and Mr. Ramos Perez did not want them to be aware of his cooperation, ECF No. [20-1] at 3-4.  The government opposed this

request, stating that the government did not believe that the cooperation was going to lead to a motion to reduce the sentence, and therefore there was no reason for delay, ECF No. [20-1] at 4. The Court denied the request for a continuance.

At the outset of the sentencing hearing, the Court ensured that Mr. Ramos Perez had reviewed the Presentence Investigation Report ("PSI") with his counsel, and that it accurately reflected, *inter alia* his personal history, as well as his mental and emotional condition, ECF No. [20-1] at 8. The Court stated that it was relying on the facts contained in that Report, ECF No. [20-1] at 8. Paragraphs 90 through 96 of the PSI describe the mental and emotional problems suffered by Mr. Ramos Perez, as well as his substance abuse problems. It describes in some detail the diagnosis and treatment that Mr. Ramos Perez received from Dr. Salvato from 2003 through 2007; and the circumstances under which he was committed to Jackson Memorial Hospital under the Baker Act in July 2009. Counsel for Mr. Ramos Perez, Mr. Rodriguez, specifically urged the Court to consider Mr. Ramos Perez's mental health problems to mitigate his sentence, arguing that Mr. Ramos Perez had been committed for mental health treatment pursuant to the Baker Act during the time of the harassing communications, and that, in addition, Mr. Ramos Perez had received psychiatric inpatient treatment two years prior to that. Counsel further argued that Mr. Ramos Perez had changed during the time he was incarcerated following his arrest since he was receiving medication, and that Mr. Ramos now understood that he was bipolar and that he needed to take his medication, ECF No. [20-1] at 17. Mr. Ramos Perez's mother also addressed the Court, emphasizing that her son was a good son who had made mistakes and had psychiatric problems, ECF No. [20-1] at 20-21. Mr. Ramos Perez spoke on his own behalf, expressing remorse for what he had done, ECF [20-1] at 22.

In imposing the sentence, the Court stated that she understood his medical condition; but that many people who suffer from depression or are bipolar and have

psychiatric problems do not engage in fraud, ECF No. [20-1] at 23.  The Court acknowledged his remorse and acceptance of responsibility, and reminded him how important it was to continue acting responsibly by taking his medication to deal with his bipolar disorder, ECF No. [20-1] at 24.  Mr. Ramos Perez was sentenced to serve 112 months of imprisonment as to Counts 1 and 2 of the Medicare fraud Information, Case No. 09-20842-CR, ECF No. [14]; and 60 months of imprisonment as to Count 2 of the harassment Indictment, Case No. 09-20681-CR, ECF No. [38].  All sentences were imposed to run concurrently with each other.

After imposing the sentence, the Court advised Mr. Ramos Perez that he had waived his right to appeal the sentence since the Court had not departed upward from the guideline range, but stated that the Court could not give him legal advice regarding that matter and if he disagreed, any notice of appeal must be filed within ten days from the date of entry of the judgment; and, that if he was unable to pay the cost of appeal, he could apply for leave to appeal in forma pauperis, ECF No. [20-1] at 30.  No appeal was filed.  On March 11, 2011, the presently pending Motion to Vacate was timely filed as to both cases.

III.    **FINDINGS OF FACT**[4]

A.    **Introduction**

At the evidentiary hearing, the Movant presented the testimony of Hugo Rodriguez, Esq. (his former attorney), Eliades Pena-Alcolea (his former domestic partner), Miguel Ramos (his father), and Arcadia Catalina Perez (his mother); and, he introduced into evidence two exhibits—a facsimile dated March 3, 2010 from attorney

---

[4]   To the extent that these Findings of Fact are more properly considered to be Conclusions of Law, and vice versa, the undersigned intends for them to be treated as such.

Rodriguez to FDC (PX 4)[5], and a Power of Attorney dated May 7, 2010, to Eliades Pena-Alcolea from the Movant (PX 5). The Government relied on its cross-examination of the Movant's witnesses, and introduced into evidence an FBI Report of Interview with the Movant in March 2009 (GX 1); an HHS Report of Interview with the Movant in September 2009 (GX 2); and an FBI Report of Interview with the Movant in July 2011 (GX 4). In addition, the parties relied upon the record in the underlying criminal cases, including the transcript of the guilty plea proceedings, 09-20842-CR ECF No. [43][6]; the transcript of the sentencing hearing, ECF No. [20-1], and the Presentence Investigation Report. The undersigned finds that the testimony of attorney Hugo Rodriguez was credible in all respects regarding the material facts of this case. This finding is based upon an evaluation of his demeanor during his testimony, his forthright admission when he did not have a specific recollection of an event, the internal consistency of his testimony, and the consistency of his testimony with the documentary record in the underlying criminal cases. The undersigned also credits the testimony of witness Eliades Pena-Alcolea, based upon his demeanor and the consistency of his testimony with that of Mr. Rodriguez. The undersigned finds that the testimony of Movant Yamill Ramos Perez was not credible based upon his demeanor, his failure to give clear and straightforward answers to questions, and the inconsistency of his testimony with the documentary record in the underlying criminal cases, including the testimony he gave at his guilty plea hearing, as well as the contradiction between his testimony and that of Mr. Rodriguez, and the motive Mr. Ramos Perez has to fabricate facts to support his claim for relief.

---

[5]  The Petitioner/Movant's exhibits are designated by the letters "PX" and the Respondent/Government's exhibits are designated by the letters "GX."

[6]  References to documents in the underlying criminal cases will be made by citing the criminal case number followed by the appropriate ECF No.

### B.   The Retention and Payment of Mr. Rodriguez

The Movant initially was charged by Indictment on August 6, 2009, for making threatening communications.  He was represented at his initial appearance on these charges on August 7, 2009, and for a short time thereafter, by attorney Alexandra Rangel and her husband, Ivan Mercado, 09-20681-CR, ECF No. [8] [12] [13].  Attorney Rodriguez testified that, thereafter, Ms. Rangel and Mr. Mercado contacted him and asked if he would be interested in representing Mr. Ramos Perez.[7]  Mr. Rodriguez is a very experienced criminal defense attorney who has been practicing for more than 25 years, with 99.5% of his practice in federal court.  He has represented more than 500 defendants.  When Ms. Rangel and Mr. Mercado spoke to Mr. Rodriguez, they told him that Mr. Ramos Perez had won the Florida Lottery, and that the legal fees would be paid from these proceeds.  Mr. Rodriguez verified that Mr. Ramos Perez had won the lottery before accepting any fees.

Accompanied by attorneys Rangel and Mercado, Mr. Rodriguez first met Mr. Ramos Perez at FDC.  On August 19, 2009, Mr. Rodriguez and his investigator, Maria Leon, met again with Mr. Ramos Perez at FDC, and he executed a retainer agreement.  That same day, Mr. Rodriguez received a $6,000.00 retainer that was given to him by Eliades Pena-Alcolea, who was the domestic partner of Mr. Ramos Perez.  On August 27, 2009, attorney Hugo Rodriguez was substituted as counsel for the Movant, 09-20681-CR, ECF No. [20] [22].  Thereafter, Mr. Rodriguez received additional payments from Mr. Pena-Alcolea.  Mr. Ramos Perez told Mr. Rodriguez that the money provided by Mr. Pena-

---

[7]  The testimony by Mr. Rodriguez regarding how he came to be retained by Mr. Ramos Perez is corroborated by the testimony of Mr. Pena-Alcolea, who stated that attorney Rangel had to withdraw because her father was ill in Spain, and she recommended attorney Rodriguez.  The testimony by Mr. Ramos Perez that Mr. Pena-Alcolea was responsible for hiring Mr. Rodriguez based on the recommendation of a friend of his at the supermarket is not credible.

Alcolea to pay the retainer was from a grocery store that Mr. Ramos Perez had purchased using the lottery proceeds.[8]

### C.   Movant's Cooperation with the Government and His Guilty Plea

From the beginning, Mr. Ramos Perez told Mr. Rodriguez that he wanted to plead guilty and cooperate with the government.  Mr. Rodriguez told Mr. Ramos Perez that if he wanted to cooperate, he needed to do so fully and that he could not shield anyone who was involved, including family members.  Mr. Rodriguez stressed that the Government knew more than they would disclose to Mr. Ramos Perez, and that they would ask questions to test his veracity, so it was important for Mr. Ramos Perez to tell the Government everything he knew.   Mr. Rodriguez never told Mr. Ramos Perez not to cooperate against Mr. Pena-Alcolea.[9]  When Mr. Ramos Perez was asked questions by

---

[8]   The testimony of Mr. Ramos Perez regarding the payments made to Mr. Rodriguez was not clear, and was inconsistent with the testimony of Mr. Rodriguez regarding the manner of payments.  Mr. Rodriguez relied on his billing records to establish that he received an initial payment of $6,000.00, and then a payment of $4,000.00 in cash, and thereafter received three cashier's checks which were represented as coming from the grocery store owned by Mr. Ramos Perez.  Mr. Pena-Alcolea testified that he had paid Mr. Rodriguez "from some moneys that Yamill had, and the other part was from the $10,000 that I still had in the savings account and the other were from the moneys of the grocery store."  It was unclear what savings account was referred to by Mr. Pena-Alcolea.  Mr. Ramos Perez testified that Mr. Rodriguez had received two lump sum payments each in the amount of $20,000.00, and that Mr. Rodriguez had told him that he could not say anything against Mr. Pena-Alcolea because Mr. Pena-Alcolea was the one making the payments, and that if Mr. Perez Ramos said anything against Mr. Pena Alcolea that Mr. Rodriguez would no longer represent him and would keep the $40,000.00.  At the evidentiary hearing, Mr. Ramos Perez did not contradict the fact that the grocery store was purchased with his lottery winnings, but testified that he did not own the grocery store and that it was owned and controlled by Mr. Pena-Alcolea. Based upon the totality of the testimony, the undersigned finds that the moneys and property owned by Mr. Ramos Perez and Mr. Pena Alcolea, as domestic partners, was jointly owned regardless of who was named as the owner of record.  The ownership in fact is not material, however, because Mr. Rodriguez believed that the money he was receiving belonged to Mr. Ramos Perez even though Mr. Pena-Alcolea was the person transmitting the payments.  The undersigned does not credit the testimony of Mr. Ramos Perez regarding the threat made by Mr. Rodriguez to withdraw and keep the money if Mr. Ramos Perez provided information to the Government about Mr. Pena-Alcolea.

[9]   The testimony of Mr. Ramos Perez that during his first meeting with attorney Rodriguez, Mr. Rodriguez told Mr. Ramos Perez that if Mr. Ramos Perez "ever mentioned

the Government regarding Mr. Pena-Alcolea, he provided information, but said that Mr. Pena-Alcolea was not involved in the Medicare fraud part of the business, although he also stated that Mr. Pena-Alcolea was aware of the fraud.[10]

At one point, Mr. Pena-Alcolea told Mr. Rodriguez that he was aware that Mr. Ramos Perez intended to cooperate with the government because Mr. Ramos Perez had told him this.  Mr. Pena-Alcolea asked Mr. Rodriguez if he was criminally exposed, and Mr. Rodriguez told him to get a lawyer to discuss this.[11]  Mr. Rodriguez told Mr. Pena-Alcolea that Mr. Ramos Perez had said that Mr. Pena-Alcolea had nothing to do with the business.  Mr. Ramos Perez said that he could not be involved with the business on paper because he was a convicted felon, so he had used Mr. Pena-Alcolea as a nominee owner.  Mr. Rodriguez never represented Eliades Pena-Alcolea, or acted as his counsel in

---

the name of Eliades Pena-Alcolea, he wouldn't be able to represent [him]" was not credible.  For example, Mr. Ramos Perez testified that when he was arrested on August 7, 2009, he felt very sick and intimidated by Mr. Rodriguez, and that Mr. Rodriguez told him that he could be sentenced up to thirty years and that it was best to sign a plea agreement and cooperate.  The record is clear that Mr. Rodriguez did not represent Mr. Ramos Perez at that time.

[10]   This finding is based upon the testimony of Hugo Rodriguez, Esq., and is corroborated by the reports prepared of interviews conducted of Mr. Ramos Perez on March 30, 2009 (GX 1); and September 2, 2009 (GX 2).  Specifically, in the March interview, Mr. Ramos Perez denied submitting fraudulent claims, but stated that he was responsible for the billing by Meli Pharmacy.  In the September interview, Ramos Perez stated that he was the owner of Meli, but that he could not put the business under his name because he had a criminal record, so he put it under the name of his domestic partner, Eliades Pena-Alcolea.  Mr. Ramos Perez admitted the fraudulent billing practices at Meli Pharmacy, and stated that the billing was initially done by a company, and was then taken over by an individual employee named Maritza who taught Mr. Ramos Perez how to bill Medicare.  Once he learned how, Mr. Ramos Perez did all the billing.  He also stated, however, that Mr. Pena-Alcolea ran the business with Mr. Ramos Perez and was aware of the fraud.  The report does not reflect that Mr. Ramos Perez stated when Mr. Pena-Alcolea became aware of the fraud.  Mr. Pena-Alcolea testified that he did not learn about the fraudulent nature of the billings until the end, and that he tried to stop it by breaking the modem in the computer.  The undersigned completely rejects as not credible the self-serving testimony by Mr. Ramos Perez that Mr. Rodriguez told him not to cooperate against Eliades Pena-Alcolea.

[11]   This testimony was corroborated by the testimony of Mr. Pena-Alcolea.

any way; and, he never prepared any documents at the request of Mr. Pena-Alcolea.[12] Mr. Rodriguez spoke to Mr. Pena-Alcolea generally about the case at the request of Mr. Ramos Perez; and did not communicate with Mr. Ramos Perez's other family members because Mr. Ramos Perez did not want Mr. Rodriguez to do so.[13]  One of the reasons for this was because Mr. Rodriguez believed that Mr. Ramos Perez's brother was also involved in committing Medicare fraud.   In addition, Mr. Rodriguez thereafter refused to speak to any family members since he believed that they were trying to obtain information from him that would be used to the detriment of Mr. Ramos Perez.

### D.    The Decision Regarding an Appeal

After he was sentenced, Mr. Ramos Perez called either Mr. Pena-Alcolea or the investigator for Mr. Rodriguez and stated that he wanted to appeal, and he also wanted to know why certain moneys that he had received from Medicare had been returned to the Government.  That message was conveyed to Mr. Rodriguez.  The day after Mr. Ramos Perez was sentenced, Mr. Rodriguez sent a facsimile to FDC requesting a "special/legal visit" for Mr. Rodriguez and Eliades Pena-Alcolea, the domestic partner of Mr. Ramos Perez who was allowed social visits as such (PX 4).  The facsimile states that they needed to discuss his appeal and the necessary attorney's fees, without other family members being present, and that they had 10 days from March 2, 2010, to file a notice of appeal.  Mr. Rodriguez requested that the visit be scheduled for March 11, 2010.  *Id.*

Mr. Rodriguez met with Mr. Ramos Perez and Mr. Pena-Alcolea at FDC prior to the expiration of the deadline for filing a notice of appeal.  Mr. Rodriguez explained that an appeal would be futile because Mr. Ramos Perez had an appeal waiver as part of his plea

---

[12]  This testimony was corroborated by the testimony of Mr. Pena-Alcolea.
[13]   The testimony of Mr. Rodriguez that the Movant did not want his attorney to speak to his family members is corroborated by the fact that, at the beginning of the sentencing hearing, Mr. Rodriguez spoke to the Court at sidebar regarding his request for a continuance on the grounds that Mr. Ramos Perez did not want his family to know of his cooperation.

agreement, but that if he wanted to do so he could.  Mr. Rodriguez told Mr. Ramos Perez

that he did not do appellate work, but that he could give Mr. Ramos Perez the names of

competent appellate attorneys if he wanted to do so.  Mr. Ramos Perez then told Mr.

Rodriguez that he was not going to appeal.[14]  Mr. Rodriguez testified credibly that if Mr.

Ramos Perez had wanted to appeal, Mr. Rodriguez would have filed the notice of appeal

on his behalf.  Mr. Rodriguez stated that he had the form on his computer and it was easy

to prepare.

### E.   Other Post-Sentencing Meetings Between the Movant and Mr. Rodriguez

Mr. Rodriguez continued to meet with Mr. Ramos Perez at FDC until he was

transferred to the facility designated for service of his sentence.  At the request of Mr.

Ramos Perez, Mr. Rodriguez arranged the preparation of a Power of Attorney that gave

Mr. Pena-Alcolea the power to transact any and all business related to Meli Pharmacy &

Supplies, Inc., including the sale of that business (PX 5).  This document was prepared

after a lawyer had called Mr. Rodriguez regarding a foreclosure on the property.  Mr.

---

[14]   The undersigned rejects the contrary testimony of Mr. Ramos Perez that he told attorney Rodriguez on the day of the sentencing that he wanted to appeal, but that Mr. Rodriguez never discussed an appeal with him, and he did not see Mr. Rodriguez until Mr. Rodriguez saw him at FDC with Mr. Pena-Alcolea and brought a "commercial paper" for him to sign.  The Movant's testimony is contradicted by the testimony of both Mr. Rodriguez and Mr. Pena-Alcolea, and is inconsistent with the facsimile sent by Mr. Rodriguez to FDC requesting a visit on March 11, 2010, to discuss an appeal, as well as the fact that the "commercial paper," a Power of Attorney, was not executed until May 2010 (PX 5).  It is also contradicted by the Affidavit filed by the Movant that states Attorney Rodriguez met with him and Eliades Pena-Alcolea and discussed an appeal, ECF No. [19-1] at ¶¶ 13, 16(5).  Mr. Ramos Perez also testified that he was not aware that he had signed an appeal waiver because Mr. Rodriguez never explained this to him.  This testimony is flatly contradicted by the transcript of the plea colloquy, where Mr. Ramos Perez testified that he had reviewed the plea agreement with his attorney and understood it, and he was given a detailed explanation of the appeal waiver by the Court, 09-20681-CR, ECF No. [43] at 16-19, 31-33.  Finally, based upon the Movant's continued desire to cooperate with the Government in the hopes of obtaining a sentence reduction (as expressed to the Court by Mr. Rodriguez at the outset of the sentencing proceedings), combined with the appeal waiver provision of the plea agreement, and cost that pursuing such an appeal would entail, it makes sense that the Movant would abandon his desire to appeal after speaking with counsel.

Rodriguez explained this to Mr. Ramos Perez, and advised him that any proceeds of the sale would go to the Government to satisfy the forfeiture judgment.  Mr. Ramos Perez then requested Mr. Rodriguez to prepare a Power of Attorney for Mr. Pena-Alcolea to handle the matter to facilitate those proceedings.  Thereafter, on May 7, 2010, at FDC, Mr. Ramos Perez executed the Power of Attorney and Mr. Rodriguez served as the notary. Nobody else was present at this meeting.

<strong>F.</strong>    <u>The Mental Health Investigation</u>

Regarding medical records, Mr. Rodriguez testified that he had received some records regarding the mental health of Mr. Ramos Perez, but he could not recall what he had received, and he no longer had the file that would contain such records since somebody acting on behalf of Mr. Ramos Perez had taken custody of that file from the office of Mr. Rodriguez while Mr. Rodriguez was out of town.  Mr. Rodriguez did not contact any of the physicians who had treated Mr. Ramos Perez for mental health issues. Mr. Rodriguez did not seek to have Mr. Ramos Perez evaluated to determine whether any mental illnesses could have affected Mr. Ramos Perez in the commission of the offenses. Mr. Rodriguez did not see any signs that gave him reason to believe that Mr. Ramos Perez was not competent either to stand trial or at the time of the offenses.    Mr. Rodriguez stated that, from the beginning, Mr. Ramos Perez intended to plead guilty and cooperate with the government, and given this posture of the case it would not be beneficial to seek a psychiatric examination because it could hurt the ability of Mr. Ramos to be a useful witness.

With respect to the claim that Mr. Rodriguez did not adequately investigate the mental health condition of Mr. Ramos Perez, the Movant testified that when he was arrested in August 2009, he was not thinking clearly because he was not on medication, but that thereafter the Bureau of Prisons gave him the medicine he needed and he could

14

think clearly.  Mr. Ramos Perez testified regarding his mental health problems,

describing generally the same information that is contained in greater detail in the PSI.[15]

### G.   The Testimony of the Movant's Parents

Miguel Ramos, the Movant's father, testified that he and his family had attempted

to communicate with Mr. Rodriguez, but that Mr. Rodriguez was rude and refused to

communicate with him.  He asked Mr. Rodriguez what was going to happen to Mr. Pena-

Alcolea, and Mr. Rodriguez told him that Mr. Pena-Alcolea had been exonerated.  Mr.

Ramos testified that he could not understand why his son was being charged and Mr.

Pena-Alcolea was not charged since they were in the business together, and he believed

that Mr. Rodriguez was not really representing his son, but was representing Mr. Pena-

Alcolea.

Arcadia Catalina Perez, the Movant's mother, also testified that Mr. Rodriguez was

rude to them, and would not discuss the case with them.  Mr. Rodriguez told her that he

had been instructed by the Movant to discuss the case only with Mr. Pena-Alcolea.  She

told Mr. Rodriguez about the Movant's bipolar condition and drug use, and that

everything he did was due to his drug use.

The undersigned credits the testimony of the Movant's parents that Mr. Rodriguez

would not discuss the case with them; Mr. Rodriguez corroborated this testimony and

explained why.  The undersigned also credits testimony that they may have believed that

Mr. Rodriguez was loyal to Mr. Pena-Alcolea; however, the undersigned finds that their

belief regarding the loyalty of Mr. Rodriguez to Mr. Pena-Alcolea was not founded and Mr.

Rodriguez had undivided loyalty to Mr. Ramos Perez.

---

[15]   Mr. Ramos Perez also made a general vague reference in his testimony to receiving
mental health treatment in Cuba when he was young, but has provided no details.

IV.   **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

A.   **Framework for Analysis**

In order to prevail on his claims of ineffective assistance of counsel, the Movant must establish that his representation by trial counsel fell below an objective standard of reasonableness, and, that but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). The burden of proof for demonstrating ineffective assistance of counsel remains on the Movant throughout this proceeding. *Roberts v. Wainwright,* 666 F.2d 517, 519 n.3 (11th Cir. 1982). In analyzing ineffective assistance claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001). In other words, when reviewing counsel's decisions, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Burger v. Kemp,* 483 U.S. 776 (1987). As stated by the Supreme Court in *Strickland*, 466 U.S. at 686, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." In this regard, the Eleventh Circuit has elaborated, "Even if many reasonable lawyers would not have done as defense counsel did . . ., no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances would have done so." *Rogers v.* Zant, 13 F.3d 384, 386 (11th Cir. 1994). Furthermore, "[t]he burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable." *Chandler v. United States*, citing *Strickland,* 466 U.S. at 688. This burden

16

of persuasion, though not insurmountable, is a heavy one. *Chandler v. United States*, 218 F.3d at 1314 (citing *Kimmelman v. Morrison,* 477 U.S. 365 (1986)).

It is well-settled that a lawyer has a duty to investigate his client's plausible defenses. *McCoy v. Newsome*, 953 F.2d 1252, 1263 (11th Cir. 1992); *Futch v. Dugger*, 874 F.2d 1483, 1486 (11th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481, 1483-84 (11th Cir. 1986). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d at 1318 n.2 and surrounding text (11th Cir. 2000). *Accord Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). As recognized in *Strickland*, 466 U.S. at 690-91, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

If counsel's performance is objectively unreasonable, the second step in the analysis is to determine whether the defendant suffered prejudice as a result of that deficient performance. In the context of a sentencing proceeding, prejudice can be established by showing a reasonable probability that the error resulted in any increased period of incarceration. *Glover v. United States*, 531 U.S. 198 (2001); *Balbuena v. United States*, 523 Fed. App'x 588, 598-99 (11th Cir. 2013).

A violation of a defendant's Sixth Amendment right to effective assistance of counsel also occurs where "an actual conflict of interest adversely affects his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980); *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Once such a showing is made, a defendant need not demonstrate a

reasonable probability that the result of such a proceeding would have been different, as required by *Strickland*; rather, prejudice is presumed.  *Mickens* at 173; *but cf. Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 265-66 (11th Cir. 2013) (the presumed prejudice rule of *Sullivan* applies only in the multiple representation context; the *Strickland* requirement of prejudice applies to other alleged attorney ethical conflicts), citing *Schwab v. Cosby*, 451 F.3d 1308, 1322-29 (11th Cir. 2006).

Finally, where the basis of the defendant's claim is that his attorney failed to file a timely notice of appeal, the "deficient performance" prong of the *Strickland* test may be satisfied in one of two ways.  The first is if the defendant expressly requests counsel to file an appeal and counsel fails to do so, because "an attorney who fails to file an appeal on behalf of a client who specifically requests it acts in a professionally unreasonable manner per se."  *Devine v. United States*, 520 F.3d 1286, 1288 (11th Cir. 2008) (citing *Gomez-Diaz v. United States*, 433 F.3d 788, 791-92 (11th Cir. 2005)).  Second, even if a habeas petitioner did not expressly request that his attorney file an appeal, "counsel generally has a duty to consult with him about an appeal," *id.*, which arises "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing," based on the totality of the circumstances at the time.  *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000).

Assuming counsel's performance is deficient, the prejudice necessary to satisfy the second *Strickland* prong is fulfilled if the petitioner can "demonstrate that there is a reasonable probability that . . . he would have timely appealed."  *Id.* at 484.  There is no requirement that the Petitioner make any showing regarding the merits of such an appeal.  *See Thompson v. United States*, 504 F.3d 1203, 1207-08 (11th Cir. 2007) ("Because a direct appeal of a federal conviction is a matter of right, . . . we determine whether a defendant has shown that there is a reasonable probability that he would have

appealed without regard to the putative merits of such an appeal."); *Gomez-Diaz v.*
*United States*, 433, F.3d 788, 793 (11th Cir. 2005) ("If the evidence establishes either that
Petitioner's attorney acted contrary to his client's wishes, or that he failed to fulfill his
duty to attempt to determine his client's wishes, prejudice is to be presumed, . . .
regardless of whether he can identify any arguably meritorious grounds for appeal that
would fit one of the exceptions contained in his appeal waiver."); *Flores-Ortega v. Roe*,
39 Fed. App'x 604, 606 (9th Cir. 2002) ("Because [counsel] had a duty to consult with
Flores and failed to do so, as a matter of law, prejudice is presumed."); *id.* at 608
(Sedwick, J., dissenting) ("The majority correctly notes that, under *Flores-Ortega*,
prejudice is presumed if counsel fails to consult with her client about a potential appeal
in which the client has demonstrated some interest.").

> **B.     The Movant Has Failed to Establish He Received Ineffective**
> **Assistance of Counsel**

> **1.     The Investigation and Presentation of Mental Health Evidence**

The Movant contends that counsel should have conducted a more thorough
investigation regarding his mental health problems by speaking to family members,
obtaining his underlying treatment records, and obtaining a mental health examination;
thereby enabling counsel to make a more persuasive argument at sentencing regarding
why the Movant's mental health problems justified a reduced sentence.

The record establishes, however, that counsel was aware of the Movant's prior
mental health issues, that they were fully described in the PSI, that counsel ensured that
the Court was aware of the Movant's mental health history, and that the Court considered
the Movant's mental health issues in determining an appropriate sentence.  The Movant
doesn't claim that his mental health issues affected his competency to stand trial or to
commit the offenses charged.  Therefore, the relevant inquiry is whether Counsel's
actions in presenting the Movant's mental health issues to the Court at sentencing were

objectively reasonable and fell within the wide range of reasonably professional assistance; and, if not, whether there is a reasonable probability that if he had taken the actions sought now by the Movant, there is a reasonable probability that the Movant would have received a lesser sentence.

As to the first prong, the undersigned concludes that Mr. Rodriguez rendered constitutionally sufficient assistance of counsel in connection with the sentencing proceeding.   He was aware of the Movant's mental health issues, and those issues were thoroughly described in the PSI, including the diagnoses, dates of treatment, medications and hospitalizations that the Movant and his family described at the evidentiary hearing on the present Motion.  The only items not presented to the sentencing judge were the underlying records and treatment notes; and a speculative claim that a mental health evaluation would have yielded additional information.  Neither the Movant nor his family pointed to any information which was not presented to the sentencing judge by Mr. Rodriguez through his argument and reference to the PSI.  Mr. Rodriguez specifically called the Court's attention to the mental health issues suffered by the Movant and called the Movant's mother to speak to the Court regarding these issues, ECF No. [20] at 17, 20-21.  Under the circumstances, in view of the information possessed by Movant's counsel at the time of the sentencing, and the fact that there was no dispute that for a number of years the Movant had various mental health issues which required treatment, it was reasonable for counsel to not engage in further investigation.

In addition, the Movant has failed to establish that if Mr. Rodriguez had spoken more to the family, had obtained medical records, or had obtained a further mental evaluation, that there is a reasonable probability the sentence would have been different. As stated above, the Movant has not pointed to any information would have been uncovered by counsel that was not already presented to the sentencing Judge.  It is also clear that there is no reasonable probability that whatever modicum of additional

particularity might have been produced would have affected the sentence imposed.  The argument of Movant's counsel that the physical presentation of a stack of medical records at the sentencing hearing would have made a difference, is not persuasive.  The Court expressly recognized at sentencing that there were many people with psychiatric problems such as depression or who are bipolar, but they do not engage in fraud.  Thus, the Court ultimately found it appropriate to impose a sentence in the middle of the advisory Sentencing Guidelines range.

Therefore, since counsel's actions fell within the wide range of reasonably professional assistance, and there is no reasonable probability that if he had done further investigation the Movant would have received a lesser sentence, the claim for relief on this ground should be denied.

### 2.   The Alleged Conflict of Interest

In the case at bar, the evidence established that Movant's counsel, Hugo Rodriguez, Esq., had no conflict of interest.  He never represented Eliades Pena-Alcolea, he never gave legal advice to Eliades Pena-Alcolea, and he never told the Movant not to provide information to the Government about Eliades Pena-Alcolea.  In fact, the report of the interview given by the Movant to the agents from the FBI and HHS-OIG in September 2009, reflect that the Movant did provide information about Mr. Pena-Alcolea (GX 2).  Specifically, the Movant stated, *inter alia*, that Mr. Pena-Alcolea ran the business with Mr. Ramos Perez and was aware of the fraud.[16]  As stated above in the Findings of Fact, there is no credible evidence that Mr. Rodriguez acted on behalf of anyone other than the Movant.

---

[16]  The undersigned recognizes that Mr. Rodriguez testified that he did not see any criminal liability on the part of Mr. Pena-Alcolea, in large part because of Mr. Ramos Perez's exculpation of Mr. Pena-Alcolea.  Nevertheless, the interview report demonstrates that the agents, at least, construed Mr. Ramos Perez's statements as attributing some level of culpability to Mr. Pena-Alcolea.  This undermines the testimony of Mr. Ramos Perez that he was told not to discuss Mr. Pena-Alcolea with the government.

Moreover, the mere fact that Mr. Pena-Alcolea acted as a conduit to pay counsel's fees on behalf of the Movant, who was his incarcerated domestic partner, does not automatically rise to the level of a conflict of interest. *See United States v. Tobon-Hernandez*, 845 F.2d 277, 281 (11th Cir. 1988) (rejecting claim of ineffective assistance of counsel where fees were paid by third party whose interests conflicted with defendant since defendant failed to provide any evidence that his lawyer represented anyone's interests other than his own, although recognizing that claim might be further developed in collateral proceedings). Initially, the credible testimony of Mr. Rodriguez establishes that Mr. Rodriguez believed the source of the funds was the Movant. Even assuming that some portion of the funds came from Mr. Pena-Alcolea, which the Movant failed to prove, there is no evidence that Mr. Rodriguez was aware of this. Moreover, even if Mr. Rodriguez knew this, there is no evidence that this had any effect on the representation provided by Mr. Rodriguez or created an actual conflict of interest.

In sum, as stated above, to succeed on a conflict of interest claim, the conflict must be actual, not speculative, and must adversely affect the lawyer's performance. The Movant has failed to establish either, and thus his Motion to Vacate on this ground should be denied.[17]

### 3.    The Failure to File a Notice of Appeal

There is no dispute that the Movant initially wanted to appeal his sentence, and that this information was conveyed to his attorney. Although there is considerable dispute about what occurred thereafter, the undersigned has found the testimony of Mr. Rodriguez credible in this regard. Specifically, Mr. Rodriguez visited with the Movant at FDC before the expiration of the deadline for filing a Notice of Appeal, and discussed

---

[17]   This finding makes it unnecessary to address the Government's alternative argument that even if there was a conflict of interest, and Mr. Rodriguez had precluded cooperation against Mr. Pena-Alcolea, there was no prejudice because such cooperation would not have been considered substantial assistance sufficient for the Government to file a motion for a downward departure from the applicable Sentencing Guideline range.

with the Movant whether to file such a Notice.  At the end of this conversation, the Movant told Mr. Rodriguez that he did not want to pursue an appeal.

Since, after consulting with Mr. Rodriguez, the Movant expressly stated that he did not want to appeal, Mr. Rodriguez did not provide ineffective assistance of counsel in failing to file a Notice of Appeal.  Therefore, this claim should be denied.

## V.   CONCLUSION

Based upon the foregoing analysis, the undersigned hereby

RECOMMENDS that the Motion to Vacate be DENIED.

The parties will have until August 20, 2015, to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  A transcript of the evidentiary hearing must be provided.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *Resolution Tr. Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED in chambers at Miami, Florida, on August 6, 2015.


_____
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies provided via CM/ECF to:
The Honorable Patricia A. Seitz, United States District Judge
All counsel of record

23